2004 UT 34

Inez Preece CAMPBELL and Matthew C. Barneck, Special Administrator and Personal Representative of the Estate of Curtis B. Campbell, Plaintiffs, Appellees, and Cross–Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant, Appellant, and Cross–Appellee.

No. 981564.

Supreme Court of Utah.

April 23, 2004.

L. Rich Humpherys, Roger P. Christensen, Karra J. Porter, Salt Lake City, Laurence H. Tribe, Kenneth J. Chesebro, Cambridge, MA, W. Scott Barrett, Logan, for plaintiffs.

Glenn C. Hanni, Paul M. Belnap, Stuart H. Schultz, Michael D. Zimmerman, James D. Gardner, Amy F. Sorenson, Salt Lake City, Sheila L. Birnbaum, New York, NY, for defendant.

George C. Harris, San Francisco, CA, for amici National Association of Independent Insurers, National Association of Mutual Insurance Companies, United Services Automobile Association, Farmers Group of Insurance Companies, SAFECO Insurance Company of America.

NEHRING, Justice:

¶ 1 We take up this case after remand from the United States Supreme Court, which held that the imposition of a $145 million punitive damages award against State Farm Mutual Automobile Insurance Company in favor of State Farm's insured, Curtis B. Campbell, and his wife, Inez Preece Campbell, was excessive and violated the due process clause of the Fourteenth Amendment to the Constitution of the United States. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (*Campbell II*) (rev'g 2001 UT 89, 65 P.3d 1134 (*Campbell I*)). The Supreme Court directed us to recalculate the punitive damages award under principles articulated in its decision. We have performed this task and reduced the jury's award to $9,018,780.75 in punitive damages, a figure nine times the

amount of compensatory and special damages awarded to the Campbells.

## I. FACTS AND PROCEDURAL HISTORY [1]

¶ 2 Mr. Campbell was responsible for an automobile accident that disabled Robert Slusher and killed Todd Ospital. At the time, Mr. Campbell was insured by State Farm up to $25,000. State Farm chose not to settle the case. At trial, Mr. Campbell was found 100 percent responsible and a judgment was entered against him for $135,000. State Farm refused to pay this amount, suggesting instead that the Campbells put their house up for sale to pay off the judgment. Although State Farm did eventually pay the judgment, the Campbells sued for bad faith. At trial, the Campbells were permitted to introduce evidence that State Farm had a comprehensive nationwide policy of handling certain claims in a like manner.

¶ 3 The jury awarded the Campbells $2,086.75 in special damages, $2.6 million in compensatory damages, and $145 million in punitive damages. The trial judge remitted this amount to $1 million in compensatory damages and $25 million in punitive damages. On appeal, we reinstated the original jury verdict of $145 million in punitive damages. State Farm then appealed our decision in *Campbell I* to the United States Supreme Court, which reversed and remanded the case to us, after determining that $145 million violated due process.

¶ 4 We first address the limitations imposed on and discretion extended to us by the Supreme Court's remand order. We then turn to our application of the Supreme Court's principles set forth in *Campbell II*.

## II. DUTY ON REMAND

■ ¶ 5 State Farm suggests that our duty in the face of a remand order demands unwavering fidelity to the letter and spirit of the mandate. *Thurston v. Box Elder County*, 892 P.2d 1034, 1038 (Utah 1995).[2] We agree. State Farm further argues that the letter and spirit of the mandate erect an impenetrable ceiling on the punitive damages award of $1,002,086.75, based on a 1–to–1 ratio of punitive damages to compensatory damages.

■ ¶ 6 State Farm makes two arguments in aid of this contention. First, it invokes what it characterizes as the "mandate rule" which, it claims, elevates all of the statements in the Supreme Court's opinion to the status of a holding, thereby binding us to what would otherwise be properly deemed dicta. Second, having identified and broadly defined a "mandate rule," State Farm then turns to the text of *Campbell II* which states that "[a]n application of the [relevant] guideposts to the facts of this case ... likely would justify a punitive damages award at or near the amount of compensatory damages." *Campbell II*, 538 U.S. at 429, 123 S.Ct. 1513. State Farm claims that, when given the dignity required by the mandate rule, this language limits our punitive damages award to the amount of compensatory damages.

¶ 7 We are both sensitive to our responsibility as an inferior court to honor the Supreme Court's remand order with utmost fidelity and skeptical of claims that our duties can be reduced to an enumerated task list imposed by a "mandate rule." We do not, therefore, interpret the Supreme Court's mandate to be as restrictive as State Farm claims. Had the letter of the Supreme Court's mandate included an express punitive damages award, our responsibilities would be easily discharged. The Supreme Court declined, however, to fix a substitute award, choosing instead to entrust to our judgment the calculation of a punitive award which both achieves the legitimate objectives of punitive damages and meets the demands of due process. We take seriously the Supreme Court's direction that "[t]he proper calcula-

---

1. A complete recitation of the facts in this case is available in *Campbell I*. 2001 UT 89 at ¶¶ 2–12, 65 P.3d 1134. An abbreviated version, applying only facts deemed relevant by the United States Supreme Court is available in *Campbell II*. 538 U.S. at 412–15, 123 S.Ct. 1513.

2. Although both parties briefed this issue for us, the Supreme Court did not address it.

tion of punitive damages under the principles we have discussed should be resolved, in the first instance, by the Utah courts." *Id.*

¶ 8 By assigning to us the duty to resolve the issue of punitive damages by fixing an award, the Supreme Court signaled its intention to vest in us *some* discretion to exercise our independent judgment to reach a reasonable and proportionate award. To faithfully exercise our discretion, we must properly identify and apply the Supreme Court's principles announced in *Campbell II*. These principles restated and refined the analytical tools first announced in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *Gore,* the Supreme Court issued an invitation to the Alabama Supreme Court to undertake on remand an "independent determination" of an appropriate punitive damages award consistent with the guideposts erected by the Supreme Court. *Id.* at 586, 116 S.Ct. 1589. We understand our duties to mirror those assigned to the Alabama Supreme Court, supplemented by the evolving principles of punitive damages jurisprudence announced in *Campbell II.*

¶ 9 It is within this delegated responsibility that the "spirit" of the Supreme Court's order of remand resides, presenting the greater challenge to us to honor that mandate. Accordingly, our view of the limits of our discretion to award punitive damages relies little on the "mandate rule" or any similar interpretive aid. Rather, the text of *Campbell II* provides us with clear direction.

■ ¶ 10 The Supreme Court has long held the view that, except when they transgress due process guarantees, punitive damages awards are properly the province of the states. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) ("Despite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion."); *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) ("[T]he propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law.").

¶ 11 Reinforcing our conclusion that we may properly exercise our judgment in fixing the punitive damages award are certain themes prominently featured in *Campbell II* and *Gore.* In both cases, the Supreme Court resisted the impulse to draw bright lines or create categorical classifications in fixing punitive damages awards, electing instead to adopt general standards and guideposts. *Campbell II,* 538 U.S. at 425, 123 S.Ct. 1513; *Gore,* 517 U.S. at 582–83, 116 S.Ct. 1589. The Supreme Court has also consistently recognized punitive damages as a means to "further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore,* 517 U.S. at 568, 116 S.Ct. 1589. Taken together, these themes create a logical underpinning to an interpretation of the Supreme Court's remand order which sanctions and expects us to exercise a considerable measure of independent judgment in fixing the punitive damages award.

¶ 12 Even the Supreme Court's observation that this case "likely would justify a punitive damages award at or near the amount of compensatory damages" does not cause us to retreat from our view that we have been granted discretion to determine the amount of punitive damages. *Campbell II,* 538 U.S. at 429, 123 S.Ct. 1513. Contrary to State Farm's assertions, this language cannot reasonably be interpreted as a conclusive determination that the magnitude of State Farm's blameworthiness merits a punitive damages award no greater than the compensatory award. These are words of prediction, not direction, and are wholly compatible with a remand order which both instructs us to apply the Supreme Court's standards with fidelity and recognizes that Utah courts are best able to address our state's legitimate interests. Consistent with that view, the Supreme Court has clearly communicated its intention to cede to us the responsibility to assess the reprehensibility of State Farm's conduct, to identify Utah's legitimate interests, and to exercise reasoned judgment in fixing punitive damages.

## III. ANALYSIS LIMITED TO ACTIVITY IN UTAH

¶ 13 While authorizing us to determine the amount of the punitive damages award, the Supreme Court leashed us more tightly to the established analytical guideposts of *Gore* in two ways: by narrowing the scope of relevant evidence which we may consider in evaluating the reprehensibility of State Farm's conduct, and by providing more detailed guidance for determining the relationship between compensatory and punitive damages. *Campbell II*, 538 U.S. at 419–22, 424–28, 123 S.Ct. 1513.

¶ 14 The Supreme Court chided us for basing our reinstatement of the jury's $145 million punitive damages award on State Farm's "nationwide policies rather than for the conduct direct [sic] toward the Campbells." *Id.* at 420, 123 S.Ct. 1513. The Supreme Court found impermissible our reliance on State Farm's conduct outside Utah in measuring the reprehensibility of the company's conduct. *Id.* at 421, 123 S.Ct. 1513. Drawing on views expressed in *Gore,* the Supreme Court limited evidence that can properly be weighed in the reprehensibility scale to behavior which took place within our borders and was directed at the Campbells. *Id.* at 421–22, 123 S.Ct. 1513. We are mindful that it was our consideration of irrelevant extra-territorial evidence concerning reprehensibility which attracted most of the Supreme Court's criticism in *Campbell II*. We therefore reevaluate State Farm's conduct based solely on its behavior that affected the Campbells and took place within Utah.

¶ 15 The Supreme Court stopped well short, however, of punctuating its disagreement with the evidence we considered in our analysis by pinning State Farm's behavior to a particular location along the reprehensibility continuum. It instead simply issued the mandate that "a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further." *Id.* at 419–20, 123 S.Ct. 1513.

¶ 16 Had the Supreme Court injected into *Campbell II* its own conclusive findings concerning the degree of State Farm's blameworthiness, it would have announced a federal standard measuring reprehensibility. By creating such a national reprehensibility standard, however, the Supreme Court would have collided with its own rationale for limiting the scope of relevant reprehensibility evidence to intra-state conduct. The Supreme Court's rejection of our consideration of State Farm's conduct in other states was grounded in the recognition that much of the out-of-state conduct was lawful where it occurred. *Id.* at 422, 123 S.Ct. 1513. The Supreme Court respected states' autonomy to make policy choices about the lawfulness of human and corporate behavior within their own borders, and used that deference to justify disallowing out-of-state conduct as an indicator of reprehensibility.

¶ 17 Just as behavior may be unlawful or tortious in one state and not in another, the degree of blameworthiness assigned to conduct may also differ among the states. As long as the Supreme Court stands by its view that punitive damages serve a legitimate means to satisfy a state's objectives to punish and deter behavior which it deems unlawful or tortious based on its own values and traditions, it would seemingly be bound to avoid creating and imposing on the states a nationwide code of personal and corporate behavior.

¶ 18 In this instance, we find the blameworthiness of State Farm's behavior toward the Campbells to be several degrees more offensive than the Supreme Court's less than condemnatory view that State Farm's behavior "merits no praise." *Id.* at 419, 123 S.Ct. 1513. We reach this conclusion after applying the relevant reprehensibility standards to the facts approved for consideration of State Farm's reprehensibility in *Campbell II,* and in light of Utah's values and traditions. We now turn to explaining how we exercised the discretion granted us by the Supreme Court to award the Campbells $9,018,780.75 in punitive damages.

## IV. FEDERAL DUE PROCESS GUIDEPOSTS

¶ 19 In *Gore,* the Supreme Court established three guideposts for punitive damages awards in *Gore:* (1) the degree of repre-

hensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell II*, 538 U.S. at 418, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 574–75, 116 S.Ct. 1589). The Supreme Court structured its constitutional review of our reinstatement of the jury's $145 million punitive damages award in *Campbell I* within the framework of these guideposts.

¶ 20 In *Campbell I*, we conducted two separate reviews of the trial court's punitive damages award, under both state and federal law.[3] In *Campbell II*, the Supreme Court limited its review of the constitutionality of our award to the *Gore* guideposts. Since *Campbell II*, we have continued to apply our state standards, recognizing that they substantially reflect the Supreme Court's directives and modifying them as necessary to fully meet the federal requirements. *See, e.g., Smith v. Fairfax Realty*, 2003 UT 41, ¶ 31, 82 P.3d 1064. However, in this case we follow the lead of the Supreme Court and restrict our review to the guideposts set forth in *Gore*.

## A. Reprehensibility

¶ 21 Just as we reinstated the jury's $145 million punitive damages award primarily because of our assessment of the reprehensibility of State Farm's conduct, *Campbell I*, 2001 UT 89, ¶¶ 27–36, 53, 65 P.3d 1134 (analyzing reprehensibility under *Crookston* standards), so do we again look primarily to *Gore's* reprehensibility guidepost to fix those damages on remand. We do so in recognition of the Supreme Court's reaffirmation in *Campbell II* that reprehensibility is " '[t]he most important indicium of the reasonableness of a punitive damages award.' " 538

U.S. at 419, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 575, 116 S.Ct. 1589).

¶ 22 Because any determination of reprehensibility inevitably implicates moral judgments and is therefore susceptible to an arbitrary, inexplicable, and disproportionate outcome, the Supreme Court has fashioned certain measuring tools. These include consideration of whether

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*

¶ 23 First, we consider whether the harm was economic or physical. We are mindful of the Supreme Court's observation that "the harm [in this case] arose from a transaction in the economic realm, not from some physical assault or trauma." *Id.* at 426, 123 S.Ct. 1513. We do not, however, read this comment to foreclose our value-based assessment of the type of injuries which may flow from the abuse of transactions in the economic realm, nor to bar us from judging the reprehensibility of such abusive conduct. The Supreme Court's observation is carefully phrased. It does not classify the injury inflicted on the Campbells by State Farm as "economic." Rather, it notes that the transaction which gave rise to the injury was in the "economic realm."

¶ 24 If we were to hold the view that insurance has no purpose beyond providing economic compensation for loss, there would be little reason to dwell on this first reprehensibility factor. So interpreted, not only would the harm caused by State Farm be purely economic in nature, but the economic harm sustained by the Campbells would be

---

**3.** In Utah, punitive damages are analyzed under a seven-factor test commonly known as the *Crookston* standards. The *Crookston* factors are: (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.
*Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 808 (Utah 1991); *see also Crookston v. Fire Ins. Exch.*, 860 P.2d 937 (Utah 1993).

minimal. State Farm ultimately paid the entire judgment which was awarded against the Campbells, including amounts in excess of the policy limits. However, we do not believe that the Campbells' injuries were limited to their economic loss.

¶ 25 Instead, we recognize that the gravity of harm which an insurer may potentially inflict on an insured is unique to the nature of the product and service that insurance provides. Life is fraught with uncertainty and risk. In Utah alone, our citizens pay nearly $1 billion annually in automobile insurance premiums in an effort to ameliorate the anxiety caused by uncertainty and risk.[4]

¶ 26 We have shaped our law relating to first party insurance contracts to recognize the practical reality "that insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 802 (Utah 1985). Peace of mind clearly plays a central role in accounting for the appeal of liability insurance.

> In insurance each party must take a risk. But it is inaccurate to assert that if the insured event does not occur then the insured receives nothing in return for the premium payment made. Each insured receives at the time of contract formation present assurance of compensation if the loss occurs which is a valuable peace-of-mind protection.

1–1 *Holmes' Appleman on Insurance 2d* § 1.3.

¶ 27 An allegation that one's negligent conduct has caused the injury or death of another inevitably triggers fear and apprehension that insurance succors.

> Insureds buy financial protection and peace of mind against fortuitous losses. They pay the requisite premiums and put their faith and trust in their insurers to pay policy benefits promptly and fairly when the insured event occurs. Good faith and fair dealing is their expectation. It is the very essence of the insurer-insured relationship. In some instances, however, insurance companies refuse to pay the promised benefits when the underwritten harm occurs. When an insurer decides to delay or to deny paying benefits, the policyholder can suffer injury not only to his economic well-being but to his emotional and physical health as well. Moreover, the holder of a policy with low monetary limits may see his whole claim virtually wiped out by expenses if the insurance company compels him to resort to court action.

2–8 *Holmes' Appleman on Insurance 2d* § 8.7.

¶ 28 As the facts of this case make clear, misconduct which occurs in the insurance sector of the economic realm is likely to cause injury more closely akin to physical assault or trauma than to mere economic loss.[5] When an insurer callously betrays the insured's expectation of peace of mind, as State Farm did to the Campbells, its conduct is substantially more reprehensible than, for example, the undisclosed repainting of an automobile which spawned the punitive damages award in *Gore*.[6]

---

**4.** Utah Department of Insurance, 2002 Utah Market Share Report—Private Passenger Auto, available at http://www.insurance.state.ut.us/MS2002/MS—PPAuto.pdf (stating that in 2002, Utahns spent $969,222,336 on automobile insurance premiums) (last visited Apr. 16, 2004).

**5.** In *Campbell II*, the Supreme Court articulated bipolar injury categories of "economic" and "physical." 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589). These categories are well suited to highlight the Supreme Court's view that the injury suffered by a misled and disappointed BMW purchaser could not reasonably justify the moral outrage which ought properly be reserved for conduct that results in physical harm. State Farm has sought to

exploit, unhelpfully in our view, an exaggerated economic versus physical dichotomy. For example, as we observed in *Campbell I*, State Farm attempted to diffuse the odious nature of its conduct by claiming that it did not "after all, involve murder, torture, or deliberate poisoning of the environment." 2001 UT 89 at ¶ 33, 65 P.3d 1134.

**6.** In *Gore*, Dr. Gore bought a new black BMW from a BMW dealership. After driving it for nine months, he took it to an independent detailer to make it look "snazzier than it normally would appear." 517 U.S. at 563, 116 S.Ct. 1589. The detailer determined that the car had been repainted to hide damage. *Id.* The damage was later shown to be caused by acid rain which settled on the car's exterior en route from Ger-

¶ 29 State Farm expressly assured the Campbells that their assets would not be placed at risk by the negligence and wrongful death lawsuit brought against them. The company then unnecessarily subjected the Campbells to the risks and rigors of a trial. State Farm disregarded facts from which it should have concluded that the Campbells faced a near-certain probability of having a judgment entered against them in excess of policy limits. When this probability came to pass, State Farm withdrew its expressions of assurance and told the Campbells to place a "for sale" sign on their house. These acts, all of which the Supreme Court conceded that State Farm had committed, *Campbell II*, 538 U.S. at 419, 123 S.Ct. 1513, and for which State Farm has not voiced so much as a whisper of apology or remorse, caused the Campbells profound noneconomic injury.

¶ 30 It simply will not do to classify this injury as solely "economic" for the purposes of evaluating it under the first prong of the *Gore* reprehensibility test, and we decline to do so. We turn now to the remaining *Gore* indicia for evaluating reprehensibility.

¶ 31 The second factor in assessing reprehensibility is whether State Farm showed indifference or reckless disregard for the health and safety of the Campbells. There is little doubt that State Farm could reasonably have known that its conduct would cause stress and trauma to a policyholder. State Farm was clearly indifferent to this result, evincing a reckless disregard for the Campbells' peace of mind.

¶ 32 The third factor is whether the victims were financially vulnerable. It remains obvious to us that not only were the Campbells financially vulnerable, but their vulnerability

enabled, if not motivated, State Farm's conduct. We need stray no further into the record than to the post-judgment advice given to the Campbells by State Farm's attorney that they put a "for sale" sign on their house to make this point. It is difficult to imagine State Farm making this statement to a sophisticated insured whom State Farm believed to have the wherewithal to protect himself from its predations.

¶ 33 Fourth, we consider whether the reprehensible conduct was repeated or merely an isolated incident. We take up this measure of reprehensibility with considerable caution because, although *Gore* instructs us to consider whether "the conduct involved repeated actions or was an isolated incident," *id.* (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589), the Supreme Court expressly found that we erred in determining that State Farm was a recidivist. *Id.* at 423, 123 S.Ct. 1513. Repeated misconduct justifies a more severe sanction both because it minimizes the likelihood that the conduct was a unique aberration and because it justifies the imposition of punitive damages as a deterrent. Although we are bound by the Supreme Court's finding that State Farm was not a recidivist, absence of prior bad acts does not mean that State Farm has forsworn the conduct that caused the Campbells' injury, and that the citizens of Utah therefore have no reason to deter State Farm's future conduct. State Farm's obdurate insistence that its treatment of the Campbells was proper clearly calls out for vigorous deterrence.

¶ 34 In *Campbell I*, we voiced our incredulity over State Farm's protestations of blamelessness. We noted:

many to the United States. *Id.* at 563, n. 1, 116 S.Ct. 1589. Other cases in the punitive damages canon are equally distinguishable from this case. For example, in *Cooper*, Cooper Industries was sued by Leatherman Tool Group for trademark infringement after Cooper used photographs of a modified version of the Leatherman tool in its ads. 532 U.S. at 427–28, 121 S.Ct. 1678. *TXO Production Corp. v. Alliance Resources Corp.* involved a slander of title to oil and gas rights owned by Alliance. 509 U.S. 443, 446, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). In a case most factually similar to the one at hand, employees of a company paid insurance premiums to an insurance agent who was obligated to turn over the

premiums to the insurer. When the agent failed to do so, the insurance policies lapsed. When one employee tried to make a claim on her insurance policy, she was denied. Once this was discovered, the employees sued the agent for fraud. *Pac. Mut. Life Ins. v. Haslip*, 499 U.S. 1, 5–6, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). However, in *Honda Motor Co. v. Oberg*, 512 U.S. 415, 418, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), the court sustained a jury award finding Honda 80 percent liable for injuries sustained by the driver of a three-wheel all-terrain vehicle manufactured by Honda that overturned, certainly a physical, and not economic, harm.

State Farm refuses in its brief on appeal to concede any error or impropriety in the handling of the Campbell case. Rather, testimony at trial indicated that State Farm was "proud" of the way it treated the Campbells. Further, State Farm asserts that it is in fact a "victim" in this case because it is the target of the secret "conspiracy" perpetrated by the Campbells, Ospital, Slusher, and their attorneys to bring this bad faith lawsuit and to share any recovery received.

2001 UT 89 at ¶ 35, 65 P.3d 1134 (internal citations omitted). The Supreme Court did not take issue with this observation. Since *Campbell I,* State Farm has directed us to no evidence suggesting that it has gained insight into the wrongfulness of its behavior or has reconsidered its feelings of pride and victimization.

¶ 35 We will not and, consistent with our duty on remand, cannot invoke deterrence as a justification for punitive damages based on conduct dissimilar to that which State Farm inflicted on the Campbells. We can, however, find ample grounds to defend an award of punitive damages in the upper range permitted by due process based on our concern that State Farm's defiance strongly suggests that it will not hesitate to treat its Utah insureds with the callousness that marked its treatment of the Campbells. *See Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶¶ 21, 34, 63 P.3d 686 (stating that the chief aggravating factor was "a lack of remorse increasing the likelihood of recidivism").

¶ 36 Lastly, we consider whether the substantial emotional damages sustained by the Campbells were the result of State Farm's intentional malice, trickery, and deceit. We conclude that the damages sustained by the Campbells were no mere accident. At trial, Ray Summers, the adjuster who handled the Campbell case, testified that State Farm resorted to various tactics to create prejudice in the event the case ever went before a jury. *Campbell I,* 2001 UT 89 at ¶ 29, 65 P.3d 1134. For example, State Farm manager Bob Nox-

on instructed Summers to manufacture the false story that Todd Ospital, who was killed in the automobile accident for which Mr. Campbell was found to be at fault, was speeding because he was on his way to see a pregnant girlfriend. *Id.* In truth, there was no pregnant girlfriend, nor was Mr. Ospital even speeding; this story was invented only to cause prejudice in the record. *Id.* This deceitful conduct can only be explained as part of a scheme to reduce State Farm's economic exposure. The possibility that its dissembling would expose the Campbells to an excess judgment must have been apparent to State Farm. To react as it did when the excess judgment became a reality only confirms the toxicity of State Farm's behavior.

### B. Ratio of Compensatory Damages to Punitive Damages

¶ 37 We turn now to the second *Gore* guidepost: the ratio between actual and punitive damages awarded. State Farm focuses its attention on the Supreme Court's statement that "[w]hen compensatory damages are substantial, then a lesser ratio [of compensatory to punitive damages], perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell II,* 538 U.S. at 425, 123 S.Ct. 1513. The compensatory damages award to the Campbells was substantial and, in the Supreme Court's view, provided them "complete compensation." *Id.* at 426, 123 S.Ct. 1513. This is due at least in part to the possibility, recognized by the Supreme Court, that the compensatory damages award for emotional distress incorporated within it a punitive component.[7] *Id.*

¶ 38 Such a conclusion, though plausible as an abstract proposition, does not account for the circumstances of the compensatory damages award in this case. The jury awarded the Campbells $2.6 million in compensatory damages. The trial court granted State Farm's motion for remittitur and reduced the award to $1 million: $600,000 for Mr. Camp-

---

**7.** *Campbell II,* 538 U.S. at 426, 123 S.Ct. 1513 (" 'In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both.' ") (quoting Restatement (Second) of Torts § 908, cmt. c (1977)).

bell and $400,000 for Mrs. Campbell. The trial court's ruling was supported by extensive and detailed findings explaining the basis for the reduced compensatory damages award. Based on this thorough record, we conclude that the trial court's compensatory damages award was purged of elements which may have been more properly placed in the category of punitive damages. We are convinced that the combined efforts of the jury and the trial judge ensured that the compensatory damages award was what it purported to be: compensation based on considered evaluation of the degree of emotional harm inflicted on the Campbells by State Farm. Because it is exclusively for actual harm sustained by the Campbells, the compensatory damages award supports a punitive damages award exceeding $1 million.

¶ 39 In its discussion of the relationship between compensatory and punitive damages, the Supreme Court reaffirmed that ratios exceeding single-digits, which it strongly implied mark the outer limits of due process, may be appropriate only where " 'a particularly egregious act has resulted in only a small amount of economic damages,' " or where " 'the monetary value of noneconomic harm may have been difficult to determine.' " *Id.* at 425, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589). These circumstances are not present here. But, neither is this a proper case to limit a punitive damages award to the amount of compensatory damages. The 1–to–1 ratio between compensatory and punitive damages is most applicable where a sizeable compensatory damages award for economic injury is coupled with conduct of unremarkable reprehensibility. This scenario, likewise, does not describe this case.

¶ 40 Here, the Campbells were awarded substantial noneconomic damages for emotional distress. As the Supreme Court noted, "Much of the distress was caused by the outrage and humiliation the

Campbells suffered at the actions of their insurer; and it is a major rule of punitive damages to condemn such conduct." *Id.* at 426, 123 S.Ct. 1513. The trial court valued the extent of the Campbells' injury at $1 million. We have no difficulty concluding that conduct which causes $1 million of emotional distress and humiliation is markedly more egregious than conduct which results in $1 million of economic harm. Furthermore, such conduct is a candidate for the imposition of punitive damages in excess of a 1–to–1 ratio to compensatory damages. Simply put, the trial court's determination that State Farm caused the Campbells $1 million of emotional distress warrants condemnation in the upper single-digit ratio range rather than the 1–to–1 ratio urged by State Farm.

¶ 41 When considered in light of all of the *Gore* reprehensibility factors, we conclude that a 9–to–1 ratio between compensatory and punitive damages, yielding a $9,018,780.75 punitive damages award, serves Utah's legitimate goals of deterrence and retribution within the limits of due process.

### C. Comparable Civil and Criminal Penalties

¶ 42 The application of *Gore's* final guidepost, the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases, to State Farm's conduct does not cause us to retreat from our determination that a punitive damages award nine times greater than the compensatory damages is called for here.

¶ 43 In *Campbell II,* the Supreme Court pointed to a potential $10,000 fine for fraud as "the most relevant civil sanction" to which State Farm was exposed for its conduct toward the Campbells.[8] 538 U.S. at 428, 123 S.Ct. 1513; *see also* Utah Code Ann. § 31A–26–303 (2003). According to the Supreme Court, this fine was "dwarfed" by the $145 million punitive damages jury award. *Id.* It is unclear, however, what amount of punitive

---

8. The Campbells also invite us to consider the possibility that State Farm's license to underwrite insurance in Utah could be revoked for failure to meet good faith requirements. We do not need to develop this argument in its entirety in order to support our punitive damages award.

However, we recognize that State Farm's behavior, particularly if it were to become a pattern in Utah, may indeed be justification for termination of its license, a penalty that surely would cost it more than $10,000.

damages would be supported by a $10,000 fine. The Supreme Court endorsed a punitive damages award of $1 million, which is one hundred times greater than the $10,000 fine. Presumably, then, this 100–to–1 ratio does not offend due process. Thus, somewhere between $1 million and $145 million, the difference between the $10,000 civil penalty and the punitive damages award becomes so great that the latter "dwarfs" the former. State Farm claims in its brief that the Supreme Court impliedly found that the civil penalty would be dwarfed by a $17 million punitive damages award. Whether or not this is true, we hold fast to our conviction that a punitive damages award of $9,018,780.75 is in line with the third *Gore* guidepost.

¶ 44 The nature of a civil or criminal penalty provides some useful guidance to courts when fixing punitive damages because it reflects "legislative judgments concerning appropriate sanctions for the conduct at issue." *Browning–Ferris*, 492 U.S. at 301, 109 S.Ct. 2909 (O'Connor, J., concurring in part and dissenting in part). However, the quest to reliably position any misconduct within the ranks of criminal or civil wrongdoing based on penalties affixed by a legislature can be quixotic. For example, while a $10,000 fine for fraud may appear modest in relationship to a multi-million dollar punitive damages award, it is identical to the maximum fine which may be imposed on a person in Utah for the commission of a first degree felony, the classification assigned our most serious crimes. Utah Code Ann. § 76–3–301 (2003).

¶ 45 The Campbells invite us to conduct anew an analysis of the potential penalties to which State Farm may be exposed, based on the narrowed range of conduct deemed relevant by the Supreme Court. While we agree that the Supreme Court opened the door to such a reassessment, we believe that it is unnecessary in light of our conclusion that $9,018,780.75 is amply supported by the $10,000 civil penalty.

¶ 46 In sum, the Supreme Court affirmed the authority of a state to "make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *Campbell II*, 538 U.S. at 422, 123 S.Ct. 1513

(citing *Gore*, 517 U.S. at 569, 116 S.Ct. 1589). It follows, therefore, that each state retains the right and the responsibility to draw on its own values and traditions when assessing the reprehensibility of tortious conduct for the purpose of reviewing the propriety of a punitive damages award, so long as that review conforms to the *Gore* guidelines and the demands of due process. To the extent that our conclusions about what size punitive damages award best serves the legitimate interests of Utah exceeds an award suggested by the Supreme Court, we are exercising what we interpret to be a clear grant of discretion to do so. We have carefully considered the scope of the Supreme Court's mandate and have endeavored scrupulously to confine ourselves to it.

### V. ATTORNEY FEES, EXCESS VERDICT, AND SPECIAL DAMAGES

¶ 47 Finally, we turn to the Campbells' claim that costs and attorney fees incurred in this action, as well as the excess portion of the verdict not covered by insurance, should be included as part of the denominator in calculating a ratio between compensatory and punitive damages. We disagree.

¶ 48 We believe that fairly read, the Supreme Court's opinion forecloses consideration of a compensatory damages number other than the $1,000,000 awarded by the jury. The Supreme Court's analysis of the reasonableness and proportionality of the punitive damages award was grounded in its conviction "that there is a presumption against an award that has a 145–to–1 ratio." *Campbell II*, 538 U.S. at 426, 123 S.Ct. 1513. While that analysis may not have been different had the denominator been $1,939,518.10 (the amount of the compensatory damages, special damages, excess verdict, and attorney fees combined), and the ratio thereby reduced to 75–to–1, the considerable attention given by the Supreme Court to the issue of compensatory damages and the methodology for arriving at a constitutionally permissible ratio of compensatory to punitive damages convinces us that we would not be at liberty to consider a substitute denominator. We do, however, include the award of special damages as part of our punitive damages

award as both parties agree it is part of the overall damages assessment.

¶ 49 To consider attorney fees and expenses in awarding punitive damages also invites unnecessary conceptual and practical complications to an already complex enterprise. In almost every case, including this one, the attorney fees and expense damage component would require its own independent reprehensibility assessment using the *Gore* standards. The manner in which a defendant conducts litigation bears a rational relationship to the conduct giving rise to the claim for punitive damages and would inevitably lead to an unseemly and time-consuming appendage to the trial.

¶ 50 The incorporation of attorney fees and expenses into the compensatory damages award would substantially alter the manner in which trials are conducted in this state. Under our general practice, the issues of whether attorney fees are available to a party and the reasonableness of the requested fees are reserved for determination by the judge after the conclusion of the trial or other proceedings. *Meadowbrook, LLC v. Flower,* 959 P.2d 115, 117–18 (Utah 1998). We have little doubt that the interests of justice would be subverted by sidetracking the focus of a trial away from the central claims of the parties and onto issues relating to attorney fees and expenses. *Id.*

## VI. CONCLUSION

¶ 51 In conclusion, we hold that State Farm's behavior toward the Campbells was so egregious as to warrant a punitive damages award of $9,018,780.75, an amount nine times greater than the amount of compensatory and special damages.

¶ 52 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Judge BILLINGS concur in Justice NEHRING'S opinion.

¶ 53 Having disqualified himself, Associate Chief Justice DURRANT does not participate herein; Utah Court of Appeals Judge JUDITH BILLINGS sat.