[No. B188427. Second Dist., Div. Eight. June 27, 2007.]

BETTY JO WALKER et al., Plaintiffs and Appellants, v.
FARMERS INSURANCE EXCHANGE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to the California Rules of Court, rules 8-1105(b) and 8-1110, this opinion is certified for publication with the exception of parts 1., 2. and 4. of the Discussion.

COUNSEL

The Quisenberry Law Firm, John N. Quisenberry, Heather M. McKeon; Esner, Chang & Ellis, Andrew N. Chang, Stuart B. Esner and Gregory R. Ellis for Plaintiffs and Appellants.

Horvitz & Levy, Barry R. Levy and Mitchell C. Tilner for Defendant and Appellant.

OPINION

**FLIER, J.**—Respondents Betty Jo Walker and Linda Williams brought an action against appellant Farmers Insurance Exchange (Farmers)[1] for breach of contract and bad faith. The jury returned a verdict for compensatory damages in excess of $1.5 million and awarded punitive damages in the amount of $8,338,255.73. The trial court conditionally granted Farmers's motion for a new trial on the award of punitive damages, unless respondents agreed to a reduction of the punitive damage award to $1.5 million. Respondents agreed to the reduction. Farmers appeals, seeking to set aside the punitive damage award. Respondents cross-appeal, contending that the trial court erred in reducing the award of punitive damages and also erred in excluding certain evidence related to the claim for punitive damages. We affirm.

## FACTS

1. *The Accident*

Respondents are lifelong friends and share a condominium at 5434 Village Green Court in Los Angeles. Respondent Walker is 76 years old; the bulk of her income is $800 per month in Social Security payments; respondent Williams is an office worker earning about $2,000 per month. As condominium owners, respondents belonged to the Village Green Homeowners Association (HOA).

Walker owned a 1990 Honda. On the afternoon of June 1, 2001, while Williams was at work, Walker was proceeding towards her detached garage to

---

[1] Two other insurance companies named by respondents' action were dismissed prior to the trial.

get her car. The garages at Village Green are not owned by the individual condominium owners and are located in a common area. When Walker saw her garage door, she pressed the remote garage door opener. Another tenant, Juanita Wasson (not a party hereto), was struck by the garage door as it was opening; Wasson was thrown to the ground and suffered a broken hip.

### 2. *The Policy*

Farmers insured HOA under a "Condominium—Premier" policy. The policy provided coverage for claims of bodily injury. The named insured was HOA. The policy also stated that an insured was: "Each other unit-owner of the described condominium, but only with respect to that person's liability arising out of the ownership, maintenance or repair of the portion of the premises which is not owned solely by the unit-owner or out of that person's membership in the Association."

### 3. *June 2001—January 2002*

About two and a half months after the accident, Wasson made a claim against HOA, which reported the claim to Farmers.

Farmers assigned the claim to John Hughes, who described himself as a "General Adjustor." He started with Farmers in 1988; from 1994 to the time of trial, he handled homeowners association claims. Hughes reported to "Commercial Team Leader" Steve Hedglin, who in turn reported to "Commercial Claims Office Manager" Thomas Weindorf.

Hughes began by contacting HOA board member Edna Ridgley, who told him that Wasson had been struck by a garage door operated by remote control. On August 23, 2001, Hughes visited the scene of the accident and took Wasson's statement. In substance, Wasson stated that someone had activated a garage door by remote control, and that the opening door threw Wasson across the driveway, breaking her hip. Hughes prepared a report summarizing HOA's coverage and the basic facts of the claim. Hedglin reviewed the report on September 25, 2001, and made the following notation: "Need insured statement. Need scene pictures in file. Need liability analysis. Liability questionable."

In October 2001, at the request of Wasson's attorney, Farmers paid Wasson $5,000 under HOA's coverage for medical expenses.

The next event was a report prepared by Hughes and sent to Hedglin. The report noted that Wasson had a broken hip and had incurred approximately $75,000 in medical bills. The report also noted the possibility of contribution

by the unit owner who had opened the garage door. However, the report noted that this unit owner advised Hughes that she did not have any liability insurance to cover her for this accident.

The rest of the year was taken up with unsuccessful attempts to obtain a further statement from HOA's Ridgley. A notation by Hedglin made in November 2001 repeated that liability was unlikely.

On January 14, 2002, Hughes spoke with Wasson's attorney, who offered to settle with HOA for medical expenses of about $71,000. Hughes told the attorney that he had not yet obtained a statement from HOA and that it was unlikely that Farmers would settle for the amount demanded.

4. *February 2002—June 2002*

Wasson filed her action on February 6, 2002; the named defendants were HOA and respondents.

Hughes received the complaint on March 6, 2002. He contacted Ridgley, who told him that respondents were unit owners. Hughes did not think that respondents were insured or covered by the policy.

Farmers assumed HOA's defense without reservation. The case was ultimately assigned to Attorney Michael O'Connor, who filed an answer on HOA's behalf. O'Connor also filed, but did not serve, a cross-complaint against respondents. A litigation report written by O'Connor shortly thereafter estimated that an adverse verdict could be in excess of $250,000 to $350,000. O'Connor's prediction turned out to be accurate. As we relate below, the eventual jury verdict in favor of Wasson was $321,406.

Respondents were served with the complaint on March 27, 2002. Respondent Williams went to HOA's Ridgley and told her that she had reviewed the CCR's (covenants, conditions and restrictions) for HOA and concluded that respondents were covered for liability because the accident occurred in a common area. Williams explained that she and respondent Walker did not carry homeowner's insurance because they were careful and only invited their lifelong friends who would not sue them.

Respondents retained the firm of Halverson & Associates. Respondents charged the retainer of $4,000 on a credit card, and continued to pay their legal bills by means of the credit card. Attorney Theresa Powell was assigned to handle their case.

Powell called Hughes and O'Connor and requested, informally, that Farmers defend respondents. These requests were denied, also informally. This led to a

formal request by Powell set forth in a letter dated April 18, 2002. The letter pointed out that the accident occurred on Village Green common property, in an area maintained and managed solely by Village Green, and that homeowners had no rights with regard to the use of the garage. When Hughes received this letter, he understood that he was under an obligation to act in good faith toward respondents, which meant, among other things, that he was to take account of facts that supported respondents. Hughes, however, concluded that respondents' potential liability had nothing to do with the ownership, maintenance or repair of the premises.

Farmers concedes that what now occurred violated Farmers's own protocol that was to be followed when a request to furnish a defense was denied by Farmers. Neither Hughes, Hedglin or even Weindorf had the authority to deny an insured's request for a defense. Only Weindorf's direct supervisor, zone manager Eric Sharp, had that authority. The protocol required the following steps: (1) upon receiving Powell's request to defend respondents, Hedglin would have reviewed the file to determine whether it presented a coverage question; (2) if he thought that there was such a question, he would have directed Hughes to prepare a coverage question review; (3) if Hedglin was satisfied with this review, he would forward it to Weindorf; (4) if Weindorf agreed, he would pass the matter on to Sharp; and (5) Sharp would make the final decision.

As it turned out, the decision to deny respondents a defense was made by Hughes and Hedglin. Hughes decided that there was a potential that respondents were individually liable since HOA had nothing to do with the garage door opener that respondent Walker used to open the garage; HOA had neither owned or furnished, nor had it operated, the garage door opener. Hughes concluded that respondents were not entitled to a defense on their individual liability; they were entitled only to a defense as HOA members. There is a short paper trail of notes exchanged between Hughes and Hedglin in which the two men agreed that Hughes's theory of the matter was correct, and that Powell should be so informed. On June 3, 2002, Hughes wrote Powell a letter in which he denied respondents a defense for their individual liability arising from the use of the garage door opener. The letter stated that respondents would be represented collectively as HOA members.

The initial decision made by Hughes and Hedglin to deny respondents a defense was not reviewed by either Weindorf or Sharp; it is another matter whether that decision was effectively ratified by Farmers. As we note below, substantial evidence supports the jury's verdict that Farmers adopted or approved the decision after it was made. On June 14, 2002, in an internal memo, Hughes stated that the tender of a defense had been denied, based on respondents' individual liability. While this memo was sent to Weindorf, at

trial Weindorf testified that he never saw this memo. According to Weindorf, the usual procedure was followed, which was to place the memo in the file without the memo being shown to, and having been read by, Weindorf. All the same, Weindorf acknowledged at trial that the denial of a defense was a "very very" important subject.

Weindorf's first and only involvement with Wasson's action was in March 2003 when he granted trial authority, which meant that he authorized that the action would be tried rather than settled.

### 5. *Respondents Settle; Wasson's Case Goes to a Verdict*

The burden of the legal fees incurred in defending Wasson's action was very onerous for respondents. By May 2003 and prior to trial, respondents could no longer manage the expense and they instructed Powell to settle, which she did for $6,500. Given their exposure, respondents were lucky to settle for this amount. The funds for the settlement came from the $4,000 retainer respondents had paid Powell's firm, and from a loan of $2,500 from a personal friend. In other words, it was all borrowed money. When they settled, respondents owed fees of over $45,000. By the time of the trial of the instant case, they still owed $25,000 on the credit card that respondents used to finance the legal fees.

Wasson's action went to a verdict of $321,406. The jury allocated 10 percent of fault to Wasson, 10 percent to respondent Walker and 80 percent to HOA.

## PROCEDURAL HISTORY

Respondents filed their action against Farmers in March 2004.

Based on stipulated facts, the parties tried to the court the issue whether Farmers had a duty to defend respondents in the Wasson action. The trial court found that, while it was not unreasonable for Farmers to conclude that Wasson had been seeking damages based on respondents' independent negligent act of using the garage door opener, there was a potential that respondents would be liable on a claim arising out of the ownership, maintenance or repair of the common area. Accordingly, the court concluded that Farmers had a duty to defend respondents in the Wasson action.

The case went to trial on the amount of damages arising from Farmers's breach of its duty to defend respondents. At the close of respondents' case, Farmers moved for a nonsuit on punitive damages on the grounds that there was no clear and convincing evidence of oppression or malice, that neither

Hughes nor Hedglin was a managing agent, and that there was no evidence that anyone in authority ratified the conduct of Hughes and Hedglin. The motion was denied.

The jury returned the following special verdicts: (1) Farmers unreasonably refused to defend respondents. (2) Respondents expended $45,431.80 in defending the Wasson action, and $6,500 in settling that action. (3) Each of the two respondents was awarded $750,000 for emotional distress. (4) Farmers had engaged in conduct with oppression; the jury found that Farmers had *not* engaged in conduct that was malicious or fraudulent. (5) One or more officers, directors or managing agents of Farmers knew of the conduct and adopted or approved it after it occurred. (6) The amount of $8,338,255.73 was awarded in punitive damages. The parties stipulated that the award of punitive damages is 1 percent of Farmers's net worth.

In posttrial proceedings, the trial court awarded respondents attorney fees of $142,778 pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 [210 Cal.Rptr. 211, 693 P.2d 796] (where insurer's tortious conduct compels insured to retain counsel to obtain benefits under policy, insurer is liable for attorney fees). The total judgment, including attorney fees, was $10,032,965.53.

Farmers moved for a judgment notwithstanding the verdict and for a new trial on the grounds, among others, that had supported its motion for a nonsuit. The trial court denied the motion for a judgment notwithstanding the verdict and granted the motion for a new trial, unless respondents agreed to a reduction of punitive damages to $1.5 million. Respondents agreed to the reduction. As noted, both sides have appealed.

## DISCUSSION

1., 2.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *The Trial Court's Order That Reduced Punitive Damages to $1.5 Million Is Affirmed*

■ "In a series of decisions culminating in *State Farm [Mut. Automobile Ins. Co. v. Campbell* (2003)] 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513], the United States Supreme Court has determined that the due process clause of the Fourteenth Amendment to the United States Constitution places

---

*See footnote, *ante*, page 965.

limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).) "Eschewing both rigid numerical limits and a subjective inquiry into the jury's motives, the high court eventually expounded in *BMW [of North America, Inc. v. Gore* (1996) 517 U.S. 559 [134 L.Ed.2d 809, 116 S.Ct. 1589]] and *State Farm* a three-factor weighing analysis looking to the nature and effects of the defendant's tortious conduct and the state's treatment of comparable conduct in other contexts. As articulated in *State Farm*, the constitutional 'guideposts' for reviewing courts are: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' " (*Id.* at pp. 1171–1172.)

▮ In finding that punitive damages in this case should be $1.5 million and not the over $8.3 million awarded by the jury, the trial court first addressed the matter of the ratio between the compensatory and punitive awards. The trial court noted the observation of the court in *Simon* that, while a ratio of three or four to one is a guideline norm, where the compensatory damages are substantial, then a lesser ratio, one that is perhaps only equal to compensatory damages, is the outermost limit of the due process guarantee. (*Simon, supra*, 35 Cal.4th at p. 1182.) The trial court found that the 5.5-to-1 ratio[8] in this case was excessive, especially in light of the much lesser degree of reprehensibility than found in *Campbell v. State Farm Mut. Auto. Ins. Co.* (2004) 2004 UT 34 [98 P.3d 409, 418], where the Utah Supreme Court, on remand from *State Farm Mut. Automobile Ins. Co. v. Campbell, supra*, 538 U.S. 408 (*State Farm*), approved a nine-to-one ratio.

As far as the reprehensibility of Farmers's conduct was concerned, the trial court referred to the following facts that indicated a relatively low level of reprehensibility: Farmers's decision caused economic harm and emotional distress, and not physical harm; Farmers's conduct did not evince an indifference or reckless disregard for the health and safety of others; Farmers's conduct toward respondents was an isolated incident; and the harm to plaintiffs was the result of oversight and a mistake. This analysis complies with the listing of factors indicating reprehensibility in the United States Supreme Court's *State Farm* decision.[9]

---

[8] If the attorney fees awarded are added to the verdict, the ratio is 4.92 to 1.

[9] " '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' [Citation.] We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

The trial court found in its minute order: "Given the very substantial compensatory damages, which in the court's view contain a punitive element, the relative lack of reprehensibility and consideration of the other factors in the cases, the court finds that an award of $1,500,000 is appropriate in this case."

■ We agree with the trial court that the compensatory damages in this case are substantial. Respondents recovered all of their economic damages, as well as attorney fees generated by their case against Farmers. In addition, respondents each received $750,000 for emotional distress. Since respondents did not have to pay attorney fees, this is quite a handsome recovery. Indeed, we agree with the trial court that there is a punitive element to respondents' recovery of compensatory damages. Thus, this case appears to come within the description of a case by the *Simon* decision where the compensatory damages are so substantial as to support only a one-to-one ratio.

The same result obtains if the case is approached from the perspective of the reprehensibility of Farmers's conduct. The only reprehensibility factor (see fn. 9) that is unquestionably present here is that respondents were financially vulnerable. As far as the trial court's findings on the balance of the reprehensibility factors are concerned, "findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (*Simon, supra,* 35 Cal.4th at p. 1172.) We return to these findings in discussing respondents' contentions in the text immediately following.

We do not agree with respondents' arguments that the trial court erred in reducing the punitive damages to $1.5 million.

First, contrary to respondents' contention, if the one-to-one ratio is upheld, the deterrent role of punitive damages would not be "eliminated." Paying $1.5 million over and above the nearly $1.7 million in compensatory damages and attorney fees cannot, as respondents contend, be put down "simply [as] just another cost of doing business." Even in this day and age, $1.5 million is a substantial sum.

■ Second, we do not agree that under the guidelines provided by the United States Supreme Court's *State Farm* decision[10] "reprehensibility factors are present here." Contrary to respondents' claim, there is nothing in the record to show that they "did in fact suffer physical . . . harm." Other than

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm, supra,* 538 U.S. at p. 419.)

[10] See footnote 9.

making this conclusory claim, respondents do not state what physical harm they suffered. Nor is there anything to show that Farmers evinced an indifference to respondents' health. The only evidence of this, according to respondents, is that Farmers denied them a defense. This is too thin a reed to lean on; it does not follow that, in denying a defense, an insurer is also necessarily indifferent to the insured's health. Nor is it sufficient for respondents to claim, again in a conclusory fashion, that Farmers's "persistent denial of a defense" satisfies the "repeated actions" prong. There was one denial of the tender of a defense; "persistent" is not the same as a repetition of the decision in other instances. For all that the record shows, Farmers's denial of respondents' tender of a defense was an isolated incident.

Third, we do not agree that the decision of the Utah Supreme Court in *Campbell v. State Farm Mut. Auto Ins. Co., supra,* 98 P.2d 409 stands for the proposition that when $1 million is awarded for emotional distress, a nine-to-one ratio is appropriate. For one, the reprehensibility factors in the Utah court's *Campbell* decision differ from those in the case before us. In fact, the Utah court found that *every one of the factors* was present in that case. (*Id.* at pp. 416–418.) That is not true of the case before us. While we agree that, given the reprehensibility of the insurer's conduct in *Campbell,* a nine-to-one ratio is not unreasonable, *Campbell* does not announce a rule that a nine-to-one ratio is to be followed every time a jury awards $1 million in emotional distress damages. In any event, even if the Utah court's *Campbell* decision announces such a rule, we would decline to adopt it; there is nothing in either federal or California law that supports such an unsound approach.

Finally, respondents cite a host of cases where ratios well in excess of a one-to-one ratio were approved. The answer to this is that we are deciding this case, and not the cases cited by respondents; the reprehensibility factors set forth in the United States Supreme Court's *State Farm* decision simply do not support the punitive damage award returned by the jury in respondents' case.

In light of the foregoing, we affirm the trial court's rulings that reduced the award of punitive damages to $1.5 million.

4. *The Exclusion of Certain Evidence Did Not Prejudice Respondents and Was in Any Event Not Error**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 965.

## DISPOSITION

The judgment, as modified by respondents' acceptance of the remitted judgment, is affirmed. Respondents Walker and Williams are to recover their costs on appeal.

Cooper, P. J., and Rubin, J., concurred.