2008 UT 64

**CHRISTENSEN & JENSEN, P.C., fka Christensen, Jensen & Powell, P.C.; and L. Rich Humpherys, Individually, Plaintiffs/Counterclaim Defendants and Appellees,**

v.

**BARRETT & DAINES; W. Scott Barrett, fka Barrett & Brady; Robert Slusher, Defendants/Counterclaim Plaintiffs and Appellants.**

No. 20061044.

Supreme Court of Utah.

Sept. 16, 2008.

Roger P. Christensen, David G. Williams, Rodney R. Parker, Karra J. Porter, Salt Lake City, for plaintiffs.

Charles R. Brown, E. Barney Gesas, Walter A. Romney, Jr., Salt Lake City, N. George Daines, Logan, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Appellants Scott Barrett and Robert Slusher, a client of Barrett's and former client of Appellees, appeal the trial court's rulings in favor of Christensen & Jensen, P.C. (formerly Christensen, Jensen and Powell, P.C.) and its attorney, L. Rich Humpherys (collectively, Appellees) on claims arising from the *Campbell v. State Farm* case.[1]

## BACKGROUND

¶ 2 In 1981, Curtis Campbell, Robert Slusher, and Todd Ospital were involved in an automobile accident that claimed the life of Todd Ospital and left Slusher permanently paralyzed. Curtis was insured by State Farm Mutual Automobile Insurance Company (State Farm) with policy limits of $25,000 per claim. As a result of the accident, Slusher sued Curtis and Todd Ospital's estate for personal injuries, and the estate—represented by Todd's parents, John and Winnifred Ospital (the Ospitals), cross-claimed against Curtis for wrongful death (1981 Trial). During that litigation, the Ospitals were represented by Appellees, Slusher was represented by Barrett, and Curtis was represented by an attorney retained by State Farm, Wendell E. Bennett. State Farm and its representatives misrepresented to Curtis the pertinent facts and issues concerning the litigation and failed to settle or attempt to settle with Slusher or the Ospitals despite having the opportunity to do so. Ultimately, in 1983, Barrett obtained a $133,098.25 judgment against Curtis on behalf of Slusher, and Humpherys obtained a $51,845.68 verdict

---

1. Our reference to the *Campbell v. State Farm* or the *Campbell* case encompasses all of the proceedings in the case's long history, including the original trial of the Campbells' claims against State Farm, the appeal by State Farm of the judgment entered after that trial, the petition for rehearing to this court, the petition for a writ of certiorari to the United States Supreme Court, the appeal before the United States Supreme Court, and the hearing on remand to this court. *See Campbell v. State Farm*, 2004 UT 34, ¶¶ 2–3, 98 P.3d 409.

against Curtis (1983 Judgment) on behalf of the Ospitals.

¶ 3 Because of State Farm's representation during the 1981 Trial, Curtis and his wife Inez (the Campbells) brought a bad faith claim against State Farm (1983 Trial).[2] Barrett and Appellees undertook Curtis' representation on that claim. Subsequently, pursuant to a retainer agreement signed by Inez on January 25, 1994, Appellees solely represented Inez on that claim.

## THE CLIENT AGREEMENTS

¶ 4 In 1984, after obtaining their respective judgments against Curtis, Slusher and the Ospitals agreed to abstain from executing against Curtis' personal assets, and in return, Curtis agreed to share with them any recovery from his bad faith claim against State Farm. In keeping with that agreement, Slusher, the Ospitals, and Curtis executed a joint-representation agreement (1984 Agreement).

¶ 5 The 1984 Agreement stipulated, amongst other things, that Slusher and the Ospitals "are willing to covenant not to execute against [Curtis'] personal assets in turn for [Curtis'] agreement herein to share with them the recovery against State Farm." The agreement also stipulated that Curtis would retain "Christensen, Jensen and Powell" and "Barrett and Brady" as his attorneys in the litigation against State Farm, and required Curtis' cooperation and assistance in litigating against State Farm. Furthermore, the agreement provided that any recovery left after expenses and the payment of the 1983 judgments would be shared amongst the parties, with 45% of the recovery going to Slusher and the Ospitals respectively, and the remaining 10% going to Curtis. Slusher and the Ospitals were to be kept fully advised of the progress and status of the claim, and their approval was required for any settlement of the claims against State Farm. All parties to the 1984 Agreement agreed to be represented by Barrett and Humpherys,

though each party retained his initial attorney separately in regards to his personal rights and obligations under the 1984 Agreement.

¶ 6 In 1995, the 1984 Agreement was modified through an oral agreement (1995 Agreement) to include Inez as a party to the agreement and to divide any net recovery equally amongst the parties, with one-third going to the Campbells, the Ospitals, and Slusher, each. All other terms regarding the agreement remained the same.

¶ 7 In 2001, after the receipt from State Farm of a settlement letter (Settlement Letter),[3] the 1995 Agreement was memorialized in a December 7, 2001 agreement (2001 Agreement).[4] By then, State Farm had paid the 1983 Judgment plus interest and costs to Slusher and the Ospitals, and this was referenced in the 2001 Agreement. In addition, the 2001 Agreement memorialized the disbursement schedule as agreed to in 1995 by the parties. Though the 2001 Agreement did not stipulate as to the representation of the parties, it was assumed by all parties to the 2001 Agreement that the representations as stipulated in 1984 were still in effect. As for Inez, she was solely represented by Appellees. Thus the 2001 Agreement was signed by Slusher, Curtis, the Ospitals, and Inez (collectively, the Clients), with Slusher, Curtis, and the Ospitals being represented by both Appellees and Barrett, while Inez was solely represented by Appellees.

¶ 8 Also in 2001, Humpherys mailed two letters to the Clients and to Barrett. The first letter was sent out in January (January Letter) and the second letter was sent out eleven months later, in December (December Letter). In the January Letter, Humpherys referenced the 1995 Agreement that acceptance of any settlement offers required their unanimous consent. In addition, the January Letter explained to the Clients that they could settle their claims individually by approaching State Farm to seek a prorated

---

2. Slusher and the Ospitals were originally plaintiffs in this case, but were later dismissed in 1987 due to a lack of standing to assert bad faith claims against State Farm. The dismissal was never challenged.

3. The Settlement Letter is the crux of this litigation and is discussed fully in the next section.

4. Curtis passed away on December 5, 2001.

settlement or by seeking an arrangement with a litigation financing company. Humpherys also requested that the Clients inform him if they wanted to pursue any of these alternative means of settlement. The December Letter specifically requested that the Clients communicate their decisions and proposals regarding settlement to Humpherys in writing.

## THE SETTLEMENT LETTER

¶ 9 The bad faith claims against State Farm resulted in a bifurcated trial with jury verdicts of $2,600,000 in compensatory damages and $145,000,000 in punitive damages against State Farm. The trial court reduced the compensatory damages to $1,000,000 and the punitive damages to $25,000,000. State Farm appealed and the Campbells cross-appealed. On October 19, 2001, the Utah Supreme Court reversed and reinstated the original jury verdict (October Opinion).

¶ 10 Sometime in October of 2001, prior to the Utah Supreme Court's issuance of its opinion, State Farm made a settlement offer of $10,000,000, which was unanimously rejected by the Clients. After the October Opinion, but prior to the receipt of the Settlement Letter, Humpherys had several conversations with State Farm attorney, Michael Zimmerman, regarding the possibility of the Campbells requesting a vacatur of the October Opinion from the Utah Supreme Court in exchange for a substantial payment from State Farm. Humpherys informed Zimmerman that such a request was unlikely. On November 16, 2001, Humpherys received the Settlement Letter dated November 14, 2001 from State Farm. In the letter, State Farm proposed to escrow the sum of $150,000,000 to be paid immediately to the Campbells upon the Utah Supreme Court's vacatur of its October Opinion. The relevant part of the letter reads:

State Farm proposes to settle on the following terms:

(i) State Farm will immediately escrow the sum of $150,000,000, to be paid to you and your clients upon the Utah Supreme Court's vacating the opinion and decision issued on October 19, 2001; and

(ii) you and your clients will join State Farm in filing with the Utah Supreme Court a notice, pursuant to Utah Rules of Appellate Procedure 37, that the matter has been settled in its entirety and is now moot, as well as a request that the court vacate its opinion and decision in the matter;

The terms of this proposed settlement are confidential and shall not be admissible in this or any other court proceeding. State Farm requests that you present this offer to your clients and respond to me in writing by noon on Friday, November 16, 2001.

In addition, the Settlement Letter stated that State Farm intended to file a Petition for Certiorari in the United States Supreme Court.

¶ 11 Upon receiving the Settlement Letter on November 16, 2001, Humpherys first contacted the Campbells and then the Ospitals regarding its contents. They declined to accept the offer if it required a vacatur of the October Opinion, as it clearly did. Thereafter, Humpherys contacted Slusher and informed him about the settlement offer and also informed him of the others' refusal to accept the offer based on the vacatur condition. It is unclear from the record if Slusher accepted or rejected the settlement offer, but it is clear that he did not approve an outright rejection of the offer. However, the record shows that the Clients and attorneys understood that pursuant to the provisions of the 1984 and the 1995 Agreements, all settlement offers had to be accepted unanimously. After speaking with the Clients, but without corresponding with Barrett, Humpherys delivered a letter to Zimmerman rejecting the $150,000,000 and explaining that his clients would not stipulate to the vacation of the opinion. After the rejection of the offer, but before the execution of the December 2001 Agreement, Humpherys mailed the Settlement Letter and the rejection letter to the Clients and to Barrett. Upon receipt of the letters, Slusher contacted Humpherys and expressed his dissatisfaction with Humpherys' handling of the settlement offer, especially his failure to initiate a meeting to discuss the issue. Slusher also expressed dissatisfaction for not having been properly notified

of the amount and the material terms of the offer, claiming that had he known all the material terms and the amount, he would have agreed to the settlement offer.

¶ 12 State Farm filed its Petition for Rehearing with this court on November 19, 2001, and upon its rejection by the court, filed a Petition for Certiorari with the United States Supreme Court. The United States Supreme Court granted State Farm's petition, reversed the $145,000,000 punitive damage award, and directed a recalculation of the punitive damage award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 429, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). This court recalculated the damages according to the United States Supreme Court's ruling, reducing the award to $9,018,780.75. *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 2004 UT 34, ¶ 51, 98 P.3d 409.

## ATTORNEY FEE AGREEMENTS

¶ 13 Under the 1984 Agreement, Christensen & Jensen and Barrett & Brady agreed to jointly represent Slusher, the Ospitals, and Campbell. Though not expressly stated in the 1984 Agreement, the subsequent actions of the parties suggest that attorney fees were to be divided equally between the two firms. As the case progressed, however, Humpherys became the lead counsel in the case. Thereafter, in 1990, Humpherys and Barrett executed another agreement (1990 Agreement) which provided that given the two attorneys' respective involvement in the case, two-thirds of the attorney fees would be apportioned to Christensen & Jensen, while the remaining one-third would be apportioned to Barrett's office. The agreement also provided that Barrett would continue to render "some assistance in the case" and Humpherys would continue to be lead counsel.

## PROCEDURAL HISTORY

¶ 14 After *Campbell* was finally adjudicated, Appellees filed a declaratory judgment action seeking a determination as to how attorney fees earned in *Campbell* should be divided between the attorneys. Barrett counterclaimed for (1) a declaratory judgment to enforce the 1984 and 1990 agreements, (2) damages for breach of the joint-representation agreement's implied covenant of good faith and fair dealing, and (3) damages for breach of fiduciary duty. Barrett and Slusher also counterclaimed against Appellees for breach of fiduciary relationship, and Slusher separately counterclaimed for (1) legal malpractice breach of fiduciary duty, (2) breach of contract, (3) constructive fraud, and (4) breach of implied covenant of good faith and fair dealing.

¶ 15 Appellees filed a motion for summary judgment on Slusher's counterclaims, which was granted. The trial court determined that "all of the loss theories advanced by [Appellants] are based on the loss of the settlement offer." The court based its ruling on the standard for causation as articulated by the Utah Court of Appeals in *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283 (Utah Ct.App.1996). In light of that standard, the court determined that there were three issues before the court: "(1) whether the Campbells and the Ospitals, if advised differently, would have accepted State Farm's offer on November 16, 2001; (2) whether Mr. Slusher, if advised differently, could have arranged for a separate settlement with State Farm; and (3) Whether the Utah Supreme Court would or would not have vacated its opinion in the *State Farm* case." Based on its analysis, the court determined that Appellants were unable to meet the standard of causation required.

¶ 16 Meanwhile, Barrett's claims proceeded to trial. At the trial, the following special verdict questions were submitted to the jury: (1) Whether a valid contract to divide attorney fees obtained from the *Campbell* litigation existed between the attorneys, with one-third of the fees going to Barrett and the remaining two-thirds going to Christensen & Jensen; (2) whether Barrett performed his obligation under the contract; and (3) whether Christensen & Jensen unreasonably prevented Barrett from performing his obligations under the contract. The jury returned a unanimous special verdict, answering yes to the first question and no to the rest. Thus, Barrett was precluded from recovering under the attorney fee agreement,

leaving only the issue of equitable remedies, if any, to be decided by the trial court.[5]

¶ 17 At a hearing on the issue of equitable remedy by the trial court, the parties submitted evidence, presented oral arguments, and responded to the trial court's questions. Barrett argued that he was entitled to $800,000 while Appellees argued that he was only entitled to $21,350. Thereafter, the trial court concluded that Barrett's actual contribution to *Campbell* was minimal and awarded him $25,000 in fees. Appellants appealed.

¶ 18 We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j) (Supp.2008).

## STANDARD OF REVIEW

¶ 19 In this case, we are presented with two issues: (1) whether Appellees are liable for legal malpractice,[6] and (2) whether the trial courts' equitable distribution of attorney fees was proper. The trial court granted summary judgment to Appellees on the malpractice claims. In reviewing a trial court's grant of summary judgment, we afford no deference to the lower court's legal conclusions and review them for correctness. *Blackner v. State Dep't of Transp.*, 2002 UT 44, ¶ 8, 48 P.3d 949. The granting of summary judgment is appropriate only in the absence of any genuine issue of material fact and where the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). Thus, in reviewing a trial court's grant of summary judgment, we review the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 15, 10 P.3d 338.

¶ 20 With respect to the attorney fee claim, Barrett argues that the method employed by the trial court in deciding how much he was entitled to amounted to an abuse of its discretion. "Equity cases afford courts discretion and latitude in fashioning equitable remedies." *Hughes v. Cafferty*, 2004 UT 22, ¶ 24, 89 P.3d 148. In reviewing a lower court's findings of fact in equity cases, appellate courts in Utah have variously described the standard as a "clearly erroneous" standard and a "clear preponderance" standard. *Compare Horton v. Horton*, 695 P.2d 102, 105 (Utah 1984) (applyng a clear preponderance standard), *and Jensen v. Brown*, 639 P.2d 150, 151–52 (Utah 1981) (holding that in equity cases, "we reverse only when the evidence clearly preponderates against the findings of the trial court"), *with MacKay v. Hardy*, 896 P.2d 626, 629 (Utah 1995) (applying the clearly erroneous standard), *Bellon v. Malnar*, 808 P.2d 1089, 1092 (Utah 1991) (also applying the clearly erroneous standard), *and Bountiful v. Riley*, 784 P.2d 1174, 1175 (Utah 1989) (applying clearly erroneous standard in equity cases). We conclude that in practice, these standards are indistinguishable. We review a trial court's findings of fact for cases in equity for clear error, and review its conclusions of law for correctness. *RHN Corp. v. Veibell*, 2004 UT 60, ¶ 35, 96 P.3d 935.

## ANALYSIS

### I. LEGAL MALPRACTICE CLAIMS

¶ 21 Legal malpractice is a general term used to describe a lawyer's wrongful action or omission that causes injury to a client. "Clients wronged by their lawyers may sue for damages based on breach of contract, breach of fiduciary duty, or negligence." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1289 (Utah Ct.App.1996) (citing Roy R. Anderson & Walter W. Steele, Jr., *Fiduciary Duty, Tort and Contract: A Primer on the Legal Malpractice Puzzle*, 47 SMU L.Rev. 235 (1994)); *see also Dunn v. McKay, Burton, McMurray & Thurman*, 584 P.2d 894, 904 (Utah 1978) (Maughan, J., dissenting) ("An action for legal malpractice may be framed conceptually as either a tort or a breach of contract."). No matter which of the three causes of action (tort, breach of

---

**5.** Prior to trial, the parties stipulated that in the event the jury found that Barrett was not entitled to a percentage of fees under the agreement, the trial court would determine the amount he was entitled to based on equitable principles.

**6.** Though initially presented as five different counterclaims at the trial level, Slusher characterizes his counterclaims on appeal as a legal malpractice claim brought under three theories: breach of fiduciary duty, negligence, and breach of contract.

contract, or breach of fiduciary duty) a client brings, the main purpose of legal malpractice actions is "to guard against and to remedy exploitation of the power lawyers possess over their clients' lives and property." *Kilpatrick*, 909 P.2d at 1289 (citing Anderson & Steele, *supra*, at 236).

¶ 22 This appeal includes all three theories of legal malpractice. We note in passing the elements of each. In a legal malpractice action based on negligence, a plaintiff must prove "(i) an attorney-client relationship; (ii) a duty of the attorney to the client arising from their relationship; (iii) a breach of that duty; (iv) a causal connection between the breach of duty and the resulting injury to the client; and (v) actual damages." *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996); *see also* 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 8.13 (2008 ed.) [hereinafter *Legal Malpractice*].

¶ 23 We have established the elements required for a legal malpractice claim based on a breach of fiduciary duty: "(1) an attorney-client relationship; (2) breach of the attorney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client." *Kilpatrick*, 909 P.2d at 1290; *see also* Restatement (Third) of the Law Governing Lawyers, § 49 (2000). Clearly, the elements required to prove both theories of legal malpractice are substantially the same.[7]

¶ 24 An action for breach of contract, however, is very different from the other two legal malpractice theories discussed above. A legal malpractice claim based on contract deals directly with the attorney's breach of a specified term in a contract between the attorney and the client, within the scope of the attorney-client relationship, that causes the client to suffer damages. In other words, "[r]ules of contract, not rules of legal malpractice, govern an action for breach of a promise." *Legal Malpractice* § 8.6. In *Bennett v. Jones, Waldo, Holbrook & McDonough*, we recognized that to state a legal

malpractice action based on breach of contract, a plaintiff must show "(1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the express promise by the defendant; and (4) damages to the plaintiff resulting from the breach." 2003 UT 9, ¶ 32, 70 P.3d 17; *see also Legal Malpractice* § 8.6.

### A. Causation in the Legal Malpractice Context

¶ 25 Although each of the theories discussed above deals with a different type of harm, "the same standard of causation applies whether the alleged wrong is a negligent act, a fiduciary breach, or even a contractual breach." *Kilpatrick*, 909 P.2d at 1291. It is causation that is at issue here.

¶ 26 We have long recognized that the standard for causation in a legal malpractice action requires "[t]he client . . . [to] show that if the attorney had adhered to the ordinary standards of professional competence and had done the act he failed to do or not done the act complained about, the client would have benefited." *Harline v. Barker*, 854 P.2d 595, 600 (Utah Ct.App. 1993). In *Kilpatrick*, the court of appeals required that in order to meet the standard for causation for a breach of fiduciary duty in a legal malpractice action, "clients must show that if the attorney had adhered to the ordinary standards of professional conduct . . . the client would have benefited." 909 P.2d at 1291 (emphasis omitted). Similarly in a breach of contract action, the non-breaching party is required to show that the breach proximately caused the damages sought. *Eleopulos v. McFarland & Hullinger, LLC*, 2006 UT App 352, ¶ 13, 145 P.3d 1157. Generally, an award of damages in a breach of contract case attempts to "place the aggrieved party in the same economic position the party would have been in if the contract was not breached." *Id.* ¶ 10 (citing *Mahmood v. Ross (In re Estate of Ross)*, 1999 UT 104, ¶ 19, 990 P.2d 933). This burden of

---

7. "Many claims brought by clients against lawyers can reasonably be classified either as for breach of fiduciary-duty or for negligence without any difference in result. For example, the duty of care enforced in a negligence action is also a fiduciary duty. . . . Most rules applicable to negligence actions also apply to actions for breach of fiduciary duty." Restatement (Third) of the Law Governing Lawyers § 49 cmt. c (2000).

establishing causation remains the same for all three legal malpractice theories. Under each theory, the client is required to show that absent the conduct complained of—whether it is a breach of an express promise or fiduciary duty by the attorney or non-adherence to proper professional conduct—the client would have benefitted. Thus, in this case, Slusher must show that absent Appellees' conduct, he would have received more than he ultimately received from the *Campbell* litigation.

### B. There Are No Genuine Issues of Material Fact As To the Causation Element

■ ¶ 27 Slusher argues that the trial court erred in granting Appellees' summary judgment motion on the issue of legal malpractice because there were material facts still in dispute. We cannot identify any such disputed facts, and Slusher has failed to call any to our attention.

¶ 28 In *Kilpatrick,* the court of appeals held that where plaintiffs' case presented "genuine issues of fact surrounding the element of causation, the trial court improperly granted summary judgment" to defendants. 909 P.2d at 1293. In that case, plaintiffs brought an action against defendant law firm for simultaneously representing plaintiffs and several other clients with conflicting interests, despite plaintiffs' objections. *Id.* at 1286–88. During their representation, plaintiffs were advised by defendant to accept a financing offer from one of defendant's clients whose interests conflicted with plaintiff, rather than a similar offer made by a non-client company. *Id.* In addition, the defendant simultaneously represented plaintiffs and two other clients in business transactions between plaintiffs and the two clients, including a joint venture. *Id.* During these simultaneous representations, the defendant prepared promissory notes and other documents containing terms disfavoring plaintiffs. *Id.* Plaintiffs brought their claim when they realized that under the documents prepared by defendant, plaintiffs were obligated to pay off debts incurred by the joint venture even after its dissolution. *Id.* at 1289. The court in *Kilpatrick* held that the trial court erred

in weighing evidence presented by the parties, finding that "[a]lthough the trial court explicitly recognized disputed facts in its oral ruling, it nonetheless pressed forward, judging the credibility of and weighing the evidence" when it should have only concerned itself with whether genuine issues of fact existed. *Id.* at 1292.

¶ 29 In the case before us, the trial court did not identify nor did it weigh any facts in dispute. Slusher argues that there are material issues of fact as to whether Appellees' breach caused Slusher to miss out on a settlement opportunity, but neglects to point out these issues. The relevant facts as to the causation element are as follows: State Farm mailed the Settlement Letter to Appellees. The Settlement Letter stated that as a condition to the settlement offer of $150,000,000, (a) the Utah Supreme Court must vacate its October Opinion; (b) the Campbells must join State Farm in filing a notice with the Utah Supreme Court, pursuant to Utah Rules of Appellate Procedure 37, stating that the matter had been settled and is now moot; and (c) the Campbells must join State Farm in requesting that the Utah Supreme Court vacate its October Opinion. Humpherys consulted with all the clients regarding the letter on November 16, 2001. Humpherys informed the Clients of the amount and the conditions. The settlement offer was rejected by the Ospitals and the Campbells, but Slusher did not approve an outright rejection of the offer. Slusher was informed about the settlement offer and also about the other clients' rejection of the offer. The entire decision-making process consisted of Humpherys contacting the clients individually via telephone to discuss the settlement; these discussions took only two hours. There was an agreement requiring a unanimous consent to settle in place at the time the offer was made and discussed. State Farm filed a Petition for Rehearing with this court on November 19, 2001, which was denied. Finally, State Farm filed a Petition for Certiorari in the U.S. Supreme Court, which was granted and ultimately resulted in a reduced award of $9,018,780.75.

¶ 30 These facts are not in dispute. Slusher has raised questions as to the unanimity

agreement, specifically stating that "the 'unanimous-consent' agreement [Humpherys] was referring to was purportedly entered into orally by the Clients in September 1995 ... [and] was formally memorialized ... three weeks after State Farm's Settlement Letter was sent to and rejected by [Humpherys]." It is not clear if Slusher is implying that there was no "unanimous-consent" agreement in place prior to the memorialization of the oral agreement in December 2001. If that is his contention, there is simply no evidence supporting it. Both the Ospitals and the Campbells in their depositions agreed that there was such an agreement; Slusher never denied that there was such an agreement; the January 2001 letter from Humpherys to the Clients specifically referenced the prior agreement to settle unanimously; the Clients had already unanimously agreed to reject a $10,000,000 settlement; and the Clients and the attorneys signed the December 2001 Agreement, which reiterated the unanimous agreement provision.

¶ 31 Slusher argues that there are disputed facts as to the existence of an attorney-client relationship between him and Humpherys, whether there was a breach of duty by Appellees, and whether Slusher suffered any damages. None of these asserted factual disputes, however, go to causation. In addition, Slusher argues that there are material issues as to whether Appellees' alleged breach—including Appellees' alleged failure to fully advise the Clients, haste in rejecting the offer, and failure to adequately explore the vacatur condition—"caused Slusher to miss out on a settlement opportunity." Once again, Slusher neglects to point out the factual disputes to which he refers.

¶ 32 Slusher further argues that a jury was required to determine the causation question. We disagree. This argument is based mainly on the court of appeals' statement in *Kilpatrick* that "[c]ausation is a highly fact-sensitive element of any cause of action." 909 P.2d at 1292. We agree that causation is highly fact-sensitive, but trial courts must still apply Utah's Rules of Civil Procedure in ruling on summary judgment motions. Slusher also directs us to the court of appeals' holding in *Kilpatrick* that because the

evidence proffered by plaintiffs showed that they would have likely made different choices which could have benefitted them if the defendant had not breached its duty of loyalty, the evidence created factual issues as to the causation element. *Id.* at 1292. Slusher argues that according to *Kilpatrick*, "likelihood" is all that is necessary to get past summary judgment, and that given State Farm's and his desire to settle, it was very *likely* that a settlement would have taken place. We interpret *Kilpatrick* differently. Here, Appellees' and Slusher's actions are not in dispute; the parties agree on what happened—Slusher wanted to settle and the Ospitals and the Campbells refused. Their agreement required unanimity for a settlement, and nothing the Appellees did or failed to do would have affected the outcome. Thus Slusher's bare assertion that settlement was "likely" is insufficient to get past summary judgment.

### C. Appellees Are Entitled to Judgment as a Matter of Law

¶ 33 There are two ways in which Slusher could have received more money than he did: First, through a unanimous acceptance by the Clients of the offer contained in the Settlement Letter or any subsequent offers; or second, through an individual settlement with State Farm. We agree with the trial court that any damages suffered by Slusher were not as a result of Appellees' actions or omissions.

### 1. Slusher's Capacity to Settle with State Farm as a Member of the Clients' Group

¶ 34 Prior to the receipt of the Settlement Letter, the Clients had a binding agreement requiring unanimity for the acceptance of any settlement offer. Upon the receipt of the Settlement Letter, Humpherys contacted the Clients and informed them of the offer and conditions contained in the letter. The Ospitals and the Campbells both rejected the offer after Humpherys' explanation, but Slusher argues that their decision was uninformed because the effects of a reversal, the possibility of a reversal, and the vacatur condition were not fully explained and explored by Humpherys. Slusher's argument

fails because both the Ospitals and the Campbells in their depositions were adamant that they rejected State Farm's offer because they were more concerned about preserving the October Opinion than they were about the money. Inez in her affidavit stated that, "[i]t was as if State Farm was trying to pay us to keep our mouths shut and to hide what we finally uncovered." When asked if she would have accepted the offer if Slusher had spoken with her and explained to her how much the money meant to him, or if Barrett had advised her that there was a fifty-percent chance the U.S. Supreme Court would grant State Farm's Petition for Certiorari, Inez responded that she would not have changed her mind. The Ospitals in their affidavits stated, "We did not feel we could accept the condition that the judgment would have to be vacated as part of the settlement." The Ospitals made their decision based on the principle that a vacatur would be unfair. Besides, "they already had a judgment for $145 million" payable without the requirement of a vacatur. The Ospitals and the Campbells rejected the $150,000,000 settlement offer not because they were a hundred percent sure that they were guaranteed the awards granted by the October Opinion, but because they were opposed to the idea of vacating the October Opinion's substance.

¶ 35 Slusher further argues that in addition to their failure to fully explore the Settlement Letter terms with the Clients, Appellees failed to fully explore the vacatur condition or to negotiate the settlement terms with State Farm. Once again, Slusher's argument does not pass muster. The Settlement Letter was clear on its terms and did not contemplate negotiation, especially regarding the vacatur.[8] Moreover, Appellees had no control over future negotiations with State Farm because, as disclosed by Zimmerman in his deposition, State Farm would not have negotiated any further unless the October Opinion was vacated. There was no possibility of negotiation; State Farm was adamant that the opinion be vacated, and the Campbells, without whom a vacatur request would be impossible, were equally adamant that there would be no vacatur. Therefore, we find that Appellees' conduct was not the reason why the Settlement Letter offer was rejected nor was it the reason why no subsequent negotiations took place.

2. Slusher's Capacity to Settle or Negotiate Separately

¶ 36 Slusher argues that Appellees' binding of the Clients to a unanimous consent agreement was improper and deprived the Clients of the opportunity to settle individually. Slusher further contends that "but for [Appellees'] breach of [their] duty of loyalty in refusing to follow Slusher's desires ... and [Appellees'] representation of other clients with adverse and conflicting interests ... there is a reasonable probability that Slusher could have settled his interest in the litigation." Also, according to Slusher, Appellees' representation of clients with conflicting and adverse interests is a violation of the Utah Rules of Professional Conduct, and "is the actual and proximate cause of Slusher's lost settlement opportunity."

¶ 37 A violation of the Rules of Professional Conduct does not itself give rise to causes of action against a lawyer because the rules were not created as a basis for civil liability. Utah Rules of Prof'l Conduct, Scope. The existence of a conflict of interest only shows that Appellees breached an applicable standard of conduct, and does not speak to whether such breach proximately caused damages, and therefore Appellees' alleged representation of clients with conflicting interests is of no moment. The issue of whether appellants were representing clients with adverse and conflicting interests is irrelevant to our decision in this case, and thus we decline to speak to it.

¶ 38 Contrary to his position here, Slusher could not have settled individually with State Farm because the condition for any settlement was a vacatur of the October Opinion. As noted in the previous section, the only clients able to join in requesting a vacatur, the Campbells, were strongly against a vacatur. We note that Slusher was given the option to settle individually with State Farm

---

8. It is difficult to see any reason for State Farm to pay the $150,000,000 it offered without the vacatur of what was for it a very negative opinion by a state supreme court.

and to assign his rights to a litigation financing company on at least one occasion prior to the receipt of the Settlement Letter. Humpherys informed the Clients that they had the option of settling with State Farm or selling their rights in the litigation to a litigation financing company in the January Letter. Humpherys also requested that the Clients inform him of their settlement desires in both the January and December Letters. Despite being given these choices, Slusher did not opt to either attempt to settle individually with State Farm or through a litigation financing company, and if he ever desired to settle individually, he neglected to inform Appellees of such desires. Furthermore, the question of what a litigation financing company would have paid for Slusher's interests is one of speculation, and causation cannot be shown through conjecture or speculation. *Dunn v. McKay, Burton, McMurray & Thurman,* 584 P.2d 894, 896 (Utah 1978).

¶ 39 The parties touched upon the issue of whether this court would have vacated the October Opinion in their briefs, but we need not address that question because we reject Slusher's arguments on causation. We conclude that absent Appellees' actions, Slusher would not have benefitted and thus affirm the trial court's summary judgment ruling.

## II. ATTORNEY FEE ALLOCATION

¶ 40 The only issue before us regarding the attorney fee agreement is whether the trial court erred in concluding that the value of Barrett's contribution to the legal work in *Campbell* amounted to $25,000. In cases of equity, we defer to a trial court's "conclusion that it had a sufficient factual basis for reaching an equitable distribution." *Parduhn v. Bennett,* 2005 UT 22, 39, 112 P.3d 495.

¶ 41 Barrett, the only appellant on this issue, does not appeal the jury's special verdict; rather, he appeals the trial court's equitable distribution of the attorney fees. On appeal, Barrett argues that the trial court erred by failing to show that its judgment flowed logically from the evidence as prescribed in *Parduhn* and by employing an

incorrect measure in fashioning a remedy. He also argues that the trial court should have relied on the 1990 Agreement in reaching an equitable distribution of the attorney fees.

¶ 42 Barrett's first argument is premised upon our language in *Parduhn,* which reads as follows:

[F]indings of fact "must show that the court's judgment or decree flows logically from, and is supported by, the evidence. The findings should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached."

*Id.* ¶ 24 (internal quotation marks omitted).

¶ 43 In reaching its decision, the trial court found that: (1) while Appellees attended and actively participated in all of the nearly 100 depositions taken in the *Campbell* case, Barrett attended only two of these depositions, and even then, did not participate; (2) Barrett prepared one pleading, consisting of five pages, out of the hundreds of pages of pleadings filed in the *Campbell* case; (3) Barrett did not appear nor did he participate as counsel in any of the hearings or at either of the bifurcated trials which lasted ten weeks, and his appearance as a spectator did not advance the *Campbell* case in any material way; (4) Barrett never advanced any funds to cover the litigation expenses which the Campbells were unable to pay and refused to do so despite Appellees' requests that he share equitably in the costs; (5) Appellees advanced all of the costs totaling more than $500,000 and bore the risk of losing these advances if the plaintiffs lost; (6) Appellees spent a large amount of time doing the work Barrett failed to do; (7) Barrett's testimony and other evidence at trial showed that Barrett did not have an understanding of the fundamental issues involved in *Campbell,* "such as the distinction between first and third-party bad faith claims, the names of key trial witnesses or the content of important exhibits and pleadings"; (8) Barrett played no role in the four appeals that occurred after the successful litigation of *Campbell;* (9) Barrett's client, and the Ospitals were dismissed as plaintiffs from the

*Campbell* case in 1987 due to lack of standing to assert bad faith claims against State Farm, and this ruling was never challenged by any of the parties; (10) Barrett's client ultimately recovered almost $3,000,000 in addition to his initial judgment, plus interest, against Campbell in the 1984 litigation; (11) Barrett's client had no rights in *Campbell* except his contractual rights to share in the proceeds from the Campbells' claims against State Farm; (12) As a party to the agreements and a recipient of a third of the *Campbell* recovery, Barrett's client was already obligated to cooperate with the Campbells and to pay Appellees their share of the contingency fee, regardless of whether Barrett encouraged him to or not; (13) Barrett was not entitled to a finder's fee or any other type of fee for encouraging Slusher's cooperation within the group, but was merely entitled to an equitable fee for the time he spent working on *Campbell.*

¶ 44 Contrary to Barrett's assertion, we conclude that the trial court's findings were sufficiently detailed to support its holding. Because the trial court's decision was an equitable one, it was not mandated to show that it adhered to specific factors or that it used a formulaic test in reaching its decision. *Hughes v. Cafferty,* 2004 UT 22, ¶ 24, 89 P.3d 148. "The court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties." *Id.* ¶ 26 (quoting 1 Spencer W. Symons, *Pomeroy's Equity Jurisprudence* § 109 (5th ed.1941)). In this case, the trial court devised a remedy based on its determination that because Barrett was not entitled to any fees under the agreement, he was only entitled to an equitable fee for the amount of work he actually performed in the case. In its findings, the trial court gave a detailed description of Barrett's involvement in the *Campbell* case, and utilizing those findings, it determined that Barrett's contribution amounted to $25,000.

¶ 45 Barrett challenges only one finding of fact. He points out that the trial court inaccurately stated that Appellees alone bore the risk of losing advanced costs if the plaintiffs lost the case. Nevertheless, even if this isolated finding of fact is inaccurate, we have long held that a reversal of a trial court's findings will occur only where the evidence clearly preponderates against the findings of the trial court. *Jensen v. Brown,* 639 P.2d 150, 152 (Utah 1981); *Crimmins v. Simonds,* 636 P.2d 478, 479 (Utah 1981); *Utah County v. Baxter,* 635 P.2d 61, 64 (Utah 1981); *Peterson v. Carter,* 579 P.2d 329, 330 (Utah 1978); *Pagano v. Walker,* 539 P.2d 452, 454 (Utah 1975); *Mollerup v. Daynes–Beebe Music Co.,* 82 Utah 299, 24 P.2d 306, 309 (1933). Because this finding relates to only one, relatively minor, factor in the court's assessment process, we conclude it does not change the balance in the preponderance of the evidence.

¶ 46 Barrett further contends that the trial court should have relied on the 1990 Agreement in reaching its conclusion because that agreement showed the parties' intended method of equitable distribution. Barrett argues that the trial court should have focused on that agreement because under *Parduhn,* a court may consider a contract, whether valid or invalid, as evidence of the intent behind the agreement. 2005 UT 22, ¶ 34, 112 P.3d 495; *see also Bennett Leasing Co. v. Ellison,* 15 Utah 2d 72, 387 P.2d 246, 247–48 (1963). The trial court's decision not to rely on the 1990 Agreement in fashioning an equitable remedy in this case was a valid exercise of its broad discretion. *Hughes,* 2004 UT 22, ¶ 24, 89 P.3d 148. Prior to submitting the special verdict to the jury, the parties agreed to allow the trial court to determine the amount of fees Barrett was entitled to if the jury found that the contract was unenforceable. The trial court was not obligated to look to that agreement because pursuant to the jury verdict, Barrett was not entitled to anything under it; and there was ample evidence of changed circumstances affecting the intent of the parties. Our language in *Parduhn* and in *Bennett Leasing Co.* merely clarified that a court in determining equitable remedies *may,* as one of its many choices, look to such agreements or contracts to discern intent. *Parduhn,* 2005 UT 22, ¶ 34, 112 P.3d 495; *Bennett Leasing Co.,* 387 P.2d at 247–48. It is not obligated to do so.

¶ 47 Furthermore, Utah's Rules of Professional Conduct specify that "division of fees

between lawyers who are not in the same firm may be made *only if, the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.*" Utah Rules of Prof'l Conduct R. 1.5(e)(1) (emphasis added). Therefore, in the absence of a joint representation agreement, a court may generally infer that the attorneys intended, pursuant to rule 1.5(e)(1), to divide the fees in proportion to the services performed by each lawyer. *Id.* Although Barrett may have intended to be paid for merely introducing Slusher to the group and signing his name on the attorney agreements, Appellees must have intended, as required by rule 1.5(d)(1), that he actually perform services in proportion to his share of fees.

¶ 48 Therefore, we affirm the trial court's equitable distribution of attorney fees. It did not abuse its discretion and reached "a result that serves equity given the overall facts and circumstances of the individual case." *Hughes,* 2004 UT 22, ¶ 24, 89 P.3d 148.

## CONCLUSION

¶ 49 We affirm the trial court's grant of summary judgment to Appellees on the legal malpractice claims because there are no issues of fact as to the causation element and because Slusher has not shown that Appellees' actions or omissions caused him to suffer any damages. Slusher could not settle with the Client group absent a unanimous agreement by the Clients; he could not settle individually with State Farm absent a request from the Campbells that this court vacate the October Opinion and the occurrence of an actual vacatur; the likelihood of Slusher benefitting from an assignment of his interests to a litigation financing company is entirely speculative; and despite being given the opportunity to do so, Slusher never opted to settle individually.

¶ 50 On the issue of the attorney fee allocation, we hold that the trial court did not abuse its discretion in effectuating a division of fees in proportion to Barrett's services performed in the *Campbell* case and therefore affirm the court's award of $25,000.

¶ 51 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.